UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | No.   4:18-CR-174 |
| v. | : | |
| | : | |
| (1) GAVIN REXER, | : | (Judge Brann) |
| (2) DENNIS PAULHAMUS, | : | |
| (3) JOSEPH POWELL, | : | |
| (4) JOHN JOSEPH, and | : | |
| (5) TIMOTHY SWEITZER, | : | |
| | : | |
| Defendants | : | |

## INFORMATION

## THE UNITED STATES ATTORNEY CHARGES:

At times material to this Information:

### Relevant Individuals and Entities

1.     Rockwater Northeast LLC (Rockwater) was a company

headquartered in Canonsburg, Pennsylvania, with facilities in the

Middle District of Pennsylvania and the Western District of

Pennsylvania.  Rockwater provided services to the hydraulic fracturing

industry in Pennsylvania, including the provision and transportation of

water and wastewater.  Rockwater was a downstream subsidiary of

Rockwater Energy Solutions, Inc., a Houston, Texas-based company.

2.     JOSEPH POWELL was the General Manager of Water

Management for Rockwater.  As General Manager, JOSEPH POWELL supervised Rockwater facilities located in Linden, Pennsylvania, within the Middle District of Pennsylvania, and Hickory and Avella, Pennsylvania, within the Western District of Pennsylvania.

3.     GAVIN REXER was the Shop Manager for the Rockwater facility located in Linden, Pennsylvania, within the Middle District of Pennsylvania.

4.     JOHN JOSEPH was the Shop Manager for the Rockwater facility located in Hickory, Pennsylvania, within the Western District of Pennsylvania.

5.     DENNIS PAULHAMUS was the owner and operator of DJ Paulhamus Trucking, an unincorporated business operating in Jersey Shore, Pennsylvania, within the Middle District of Pennsylvania.  DJ Paulhamus Trucking provided hauling services to Rockwater.

6.     TIMOTHY SWEITZER was the owner and operator of Sweitzer's Garage LLC, and was a Pennsylvania certified vehicle safety inspector.  Sweitzer's Garage LLC was a vehicle service facility headquartered in Jersey Shore, Pennsylvania, within the Middle

2

District of Pennsylvania.  Sweitzer's Garage LLC offered repair, maintenance, and performance installations for diesel vehicles, and performed Pennsylvania state inspection services.

7.    The Environmental Protection Agency (EPA) was an agency of the United States responsible for enforcing and administering the Clean Air Act.

8.    The Federal Motor Carrier Safety Administration (FMCSA) was an agency of the United States Department of Transportation (USDOT) responsible for regulating the safe and efficient travel of commercial motor vehicles.  Companies that maintained commercial motor vehicles to transport passengers or haul cargo in interstate commerce were required to register with the FMCSA and obtain a USDOT number that served as a unique identifier.

9.    Rockwater, when it was formerly known as Red Oak Water Transfer Northeast LLC, registered with FMCSA as an interstate carrier of oil field equipment and was assigned USDOT number 1893956.

## Emissions Systems and Regulations

10.    The purpose of the Clean Air Act was to protect and enhance the quality of the nation's air resources, thus promoting public health and welfare by, among other things, reducing the emission of pollutants, such as nitrogen oxides, particulate matter, hydrocarbons, and carbon monoxide, from motor vehicles.

11.    The Clean Air Act and its implementing regulations established standards limiting the emission of pollutants from various classes of motor vehicle engines, including heavy-duty diesel engines.

12.    To meet emissions standards, manufacturers of vehicles bearing heavy-duty diesel engines installed a variety of hardware emissions control devices, including exhaust gas recirculation systems, selective catalytic reduction systems, and diesel particulate filters. After verifying that the emissions control devices conformed to emissions standards, the EPA issued Certificates of Conformity to vehicle manufacturers specific to each annual vehicle class.

13.    To enforce compliance with emissions standards, the EPA, pursuant to its regulatory authority, created regulations requiring

4

manufacturers to install on-board diagnostic systems (OBDs) on vehicles. OBDs monitored emissions-related sensors and the hardware emissions control devices of heavy-duty diesel engine systems and components.

14.     OBDs alerted vehicle operators, through a malfunction indicator light, when a component of the emissions-monitoring system deteriorated or malfunctioned. When the malfunction was left unaddressed and the vehicle's emissions exceeded certain emissions level thresholds, the OBD forced the vehicle's engine to shut down, or limited the vehicle to a maximum speed of as low as five miles per hour; an effect commonly referred to as "limp mode" or "power reduced mode."

15.     Repairs for malfunctioning or deteriorating emissions systems on diesel vehicles in "limp mode" ordinarily cost between approximately $1,000 and $10,000. Repairs ordinarily took several days or weeks to complete, during which time the vehicles were inoperable.

16.     The Clean Air Act prohibited any person from tampering with or rendering inaccurate vehicle emissions monitoring devices and

5

methods, including OBDs and hardware emissions control devices.

17.   The FMCSA, pursuant to its regulatory authority, required commercial motor vehicles to pass annual inspections. The FMCSA delegated the administration of those inspections to certain states, including Pennsylvania, whose inspection standards met minimum federal standards.

18.   In Pennsylvania, the Pennsylvania Department of Transportation (PennDOT) oversaw motor vehicle safety inspection programs. PennDOT, pursuant to its regulatory authority, required commercial diesel-powered motor vehicles to pass a safety inspection, and prohibited any device or modification that bypassed exhaust system emissions components. Pennsylvania prohibited the intentional modification or alteration of a factory-installed smoke control system on diesel-powered vehicles and their fuel systems that limited the system's ability to control smoke. Pennsylvania also prohibited removal of the smoke control system, except for repair or installation of a proper replacement. Pennsylvania further prohibited disabling, altering, and changing an emission control system of a vehicle, requiring all original

6

emissions control components to be present and functioning.

19. PennDOT required annual vehicle safety inspections to ensure that vehicles were maintained for safe operation. The safety inspection procedure included inspection and testing of a variety of vehicle components, including hardware emissions systems. Certified vehicle safety inspectors performed vehicle safety inspections at official PennDOT inspection stations. Certified vehicle safety inspectors affixed a certificate to vehicles that passed inspection, to demonstrate compliance with PennDOT inspection standards, and reported the inspection results to PennDOT.

## Emissions System Tampering Devices

20. Hardware emissions control devices and OBDs could be disabled on commercial vehicles bearing heavy-duty diesel engines, using a variety of aftermarket devices. Disabling the emissions control systems defeated their ability to limit pollutant gases and particulate matter into the atmosphere.

21. One method used to disable hardware emissions control devices was to remove the portion of the vehicle's exhaust system that

7

contained the emission control devices and replace it with a section of exhaust tubing or a "straight pipe" that did not limit emissions.

22.     Another, generally less expensive method used to disable hardware emissions control devices was to remove certain components, such as the selective catalytic reduction system and diesel particulate filter, by hollowing out their casing in the vehicle's exhaust pipe, and then re-welding the entry point to create the false appearance that the hardware emissions control devices remained installed.

23.     OBDs detected disabling modifications to the hardware emissions control devices on vehicles.  Thus, any modifications to the hardware emissions control devices necessarily included a contemporaneous disabling of the OBD, to avoid the vehicle going into "limp mode."

24.     The devices used to disable OBDs commonly were referred to as "defeat devices," "DPF defeats," "delete devices," "tuners," "performance tuners," "conversion kits," and "programmers," (collectively referred to as "defeat devices").  Several manufacturers offered a variety of defeat devices.

25.    One type of defeat device was an apparatus that plugged into a vehicle's data link connector to "tune" the OBD. Those defeat devices, when plugged in, allowed the vehicle operator to activate at will the software modifications that manipulated the OBD.

26.    Another type of defeat device was a software program that reprogrammed, or "flashed," the vehicle's diesel engine computer module, through use of a computer or electronic device that modified the OBD after being connected to the vehicle on a single occasion. Those defeat devices permanently adjusted the diesel engine timing and other parameters to bypass the OBD.

27.    In addition to disabling the OBD, defeat devices also improved heavy-duty diesel engines' horsepower, torque, and fuel efficiency.

9

## THE UNITED STATES ATTORNEY CHARGES:

### COUNT ONE
### Conspiracy to Defraud the United States and to
### Violate the Clean Air Act, 18 U.S.C. § 371

28.     The factual allegations of paragraphs 1 through 27 of this

Information are incorporated here.

29.     From on or about August 1, 2013, the exact date being

unknown to the United States Attorney, and continuing thereafter until

on or about June 30, 2014, in the Middle District of Pennsylvania, and

elsewhere, the defendants,

GAVIN REXER,
DENNIS PAULHAMUS,
JOSEPH POWELL,
JOHN JOSEPH, and
TIMOTHY SWEITZER,

knowingly and willfully conspired, combined, confederated, and agreed

together and with other persons both known and unknown to the

United States Attorney, to:

> a. defraud the United States by impairing, impeding,
>
> obstructing, and defeating the lawful functions of the federal
>
> government, that is, the EPA's function of implementing and

10

enforcing emissions standards for air pollutants for diesel
vehicles under the Clean Air Act, and the FMCSA's function
of implementing and enforcing annual inspections standards
for commercial motor vehicles, by deceitful and dishonest
means, in violation of Title 18, United States Code, Section
371; and

b. violate the Clean Air Act by tampering with and rendering
inaccurate monitoring devices and methods required
pursuant to the Clean Air Act to be maintained and followed,
in violation of Title 42, United States Code, Section
7413(c)(2)(C).

## Manner and Means

The objects of the conspiracy were accomplished, in part, by the
following manner and means:

30.   GAVIN REXER, JOSEPH POWELL, and JOHN JOSEPH
agreed together and with other co-conspirators to reduce the repair
costs and maintenance down time triggered by malfunctioning or

11

deteriorating emissions systems on Rockwater commercial motor
vehicles containing heavy-duty diesel engines.

31. GAVIN REXER, JOHN JOSEPH, and other co-conspirators
replaced and caused to be replaced hardware emissions control devices
on Rockwater commercial motor vehicles containing heavy-duty diesel
engines with exhaust tubing or "straight pipes."

32. GAVIN REXER, JOHN JOSEPH, TIMOTHY SWEITZER,
and other co-conspirators removed and caused to be removed hardware
emissions control devices on Rockwater commercial motor vehicles
containing heavy-duty diesel engines, by extracting the emissions
control devices from their compartments, and then re-welding the entry
point to create the false appearance that the hardware emissions
control devices remained installed.

33. GAVIN REXER and other co-conspirators sold titanium and
other metals extracted from the hardware emissions control devices.

34. GAVIN REXER, JOSEPH POWELL, JOHN JOSEPH, and
other co-conspirators approved of Rockwater purchasing and arranged
for Rockwater to purchase defeat devices from DENNIS PAULHAMUS.

35. GAVIN REXER, JOSEPH POWELL, JOHN JOSEPH, and other co-conspirators approved of Rockwater purchasing and arranged for Rockwater to purchase defeat devices from TIMOTHY SWEITZER and Sweitzer's Garage LLC.

36. The defendants and other co-conspirators concealed and caused to be concealed the purchase of the defeat devices in purchase invoices and in Rockwater's books and records, including by mislabeling the defeat devices as "complete exhaust systems" and "replace exhaust systems."

37. The defendants and other co-conspirators used and caused to be used defeat devices to disable the OBDs on Rockwater vehicles whose hardware emissions control devices had been removed.

38. GAVIN REXER, JOHN JOSEPH, and other co-conspirators arranged and caused to be arranged for Rockwater vehicles with disabled OBDs and hardware emissions control devices, to undergo annual PennDOT vehicle safety inspections by TIMOTHY SWEITZER, Sweitzer's Garage LLC, and other co-conspirators.

39. TIMOTHY SWEITZER, Sweitzer's Garage LLC, and other co-conspirators knowingly and intentionally issued certificates falsely stating that Rockwater vehicles with disabled OBDs and hardware emissions control devices met PennDOT inspection standards.

40. TIMOTHY SWEITZER, Sweitzer's Garage LLC, and other co-conspirators knowingly and intentionally submitted and caused to be submitted vehicle safety inspections reports to PennDOT stating that Rockwater vehicles with disabled OBDs and hardware emissions control devices had passed safety inspections.

## Overt Acts

In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Middle District of Pennsylvania and elsewhere:

41. Between on or about August 1, 2013 and June 30, 2014, GAVIN REXER, JOHN JOSEPH, and other co-conspirators removed hardware emissions control devices from more than 30 Rockwater commercial motor vehicles containing heavy-duty diesel engines.

14

42.    Between on or about September 1, 2013 and May 16, 2014, GAVIN REXER, JOHN JOSEPH, and other co-conspirators caused Rockwater to purchase at least 27 defeat devices and "straight pipes" from DENNIS PAULHAMUS for approximately $62,000, including premium mark-ups paid to DENNIS PAULHAMUS for his personal profit.

43.    Between on or about September 1, 2013 and May 16, 2014, DENNIS PAULHAMUS issued and caused to be issued at least 16 invoices to Rockwater for defeat devices and "straight pipes," in which the defeat devices and "straight pipes" were mislabeled as "complete exhaust system."

44.    Between on or about April 14, 2014 and June 27, 2014, GAVIN REXER, JOHN JOSEPH, and other co-conspirators caused Rockwater to purchase and trade for approximately 20 defeat devices from TIMOTHY SWEITZER and Sweitzer's Garage LLC, for approximately $1,200 and other remuneration, including premium mark-ups paid to TIMOTHY SWEITZER and Sweitzer's Garage LLC for their personal profit.

45.    Between on or about April 14, 2014 and June 27, 2014,
TIMOTHY SWEITZER and Sweitzer's Garage LLC issued and caused
to be issued approximately seven invoices to Rockwater for defeat
devices, in which the defeat devices were mislabeled as various
iterations of the phrase "replaced exhaust system."

46.    Between on or about September 1, 2013 and June 30, 2014,
GAVIN REXER, JOHN JOSEPH, and other co-conspirators used defeat
devices to disable the OBDs for more than 30 Rockwater vehicles whose
hardware emissions control devices had been removed.

47.    Between on or about August 1, 2013 and June 30, 2014,
JOSEPH POWELL and other co-conspirators approved the purchase of
defeat devices from DENNIS PAULHAMUS, TIMOTHY SWEITZER,
and Sweitzer's Garage LLC, and their installation on Rockwater
vehicles.

48.    Beginning in or about September 2013, TIMOTHY
SWEITZER, Sweitzer's Garage LLC, and other co-conspirators passed
for annual inspection Rockwater vehicles with disabled OBDs and

16

hardware emissions control devices, and reported the inspections to PennDOT.

All in violation of Title 18, United States Code, Section 371.

DAVID J. FREED
United States Attorney

Date: May 23, 2018          By:

PHILLIP J. CARABALLO
Assistant United States Attorney

SEAN CAMONI
Assistant United States Attorney

PATRICIA C. MILLER
Special Assistant United States
Attorney

17